UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Edmond Melkomian,<br><br>Plaintiff,<br><br>vs.<br><br>**VT Services, Inc., also known as VTG,**<br><br>Defendant. | C/A No: 3:26-cv-5719-JFA-MGB |

**COMPLAINT AND JURY DEMAND**

Plaintiff Edmond Melkomian ("Melkomian"), by and through undersigned counsel, brings this action against Defendant VT Services, Inc., also known as VTG ("VTG"), and alleges as follows:

**NATURE OF THE ACTION**

1. This employment-discrimination action arises from VTG's removal of Melkomian's core duties, subordination of him to a younger white employee, discipline, leave, and termination because of his age, Armenian race and ancestry, and Iranian national origin, and in retaliation for his opposition to race discrimination in hiring.

2. Melkomian seeks relief under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act of 1967 ("ADEA"), and 42 U.S.C. § 1981.

## PARTIES

3. Melkomian is a 61-year-old Armenian man who was born in Iran.

4. VTG is a private company that employed Melkomian on its Air Forces Central ("AFCENT") contract at Shaw Air Force Base in South Carolina.

5. At all relevant times, VTG was an employer within the meaning of Title VII and the ADEA because it employed at least 15 employees for Title VII coverage and 20 employees for ADEA coverage during the applicable statutory periods.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over Melkomian's Title VII claims under 42 U.S.C. § 2000e-5(f)(3).

7. This Court has federal-question jurisdiction over Melkomian's ADEA and § 1981 claims under 28 U.S.C. § 1331.

8. Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3) because the challenged employment practices occurred at or in connection with Melkomian's work at Shaw Air Force Base in South Carolina, where he would have continued working absent VTG's unlawful conduct.

## ADMINISTRATIVE PREREQUISITES

9. Melkomian filed EEOC Charge No. 570-2026-02621 against VT Services, Inc./VTG, alleging discrimination based on age, race, and national origin and retaliation arising from the conduct alleged below.

10. More than 60 days elapsed after Melkomian filed his charge before he commenced this action.

11. On August 27, 2026, the EEOC dismissed the charge without making a determination on the merits and issued Melkomian a Notice of Right to Sue.

12. Melkomian received the Notice of Right to Sue on or about the date the letter was sent, and this action is filed within 90 days of that receipt as required by 42 U.S.C. § 2000e-5(f)(1) and 29 U.S.C. § 626(e).

13. Melkomian has satisfied all conditions precedent to his Title VII and ADEA claims.

## FACTUAL ALLEGATIONS

### A. **Hiring and Strong Performance**

14. VTG hired Melkomian in May 2024 as a Cloud Architect supporting the AFCENT contract at Shaw Air Force Base, under supervisor Gary Mansell, at an annual salary of $135,000 plus a $5,000 bonus.

15. VTG increased Melkomian's annual pay from $135,707.04 to $141,151.20 in January 2025 and awarded him a $250 bonus in April 2025.

16. Melkomian received formal recognition in October 2024, a Rising Star award and $1,500 bonus in September 2025, and positive feedback for his technical presentations.

17. In October 2025, Mansell rated Melkomian as "FAR EXCEEDS" or "CONSISTENTLY EXCEEDS," praised his work and communication, and recognized his role in identifying substantial cost savings for the customer.

18. Earlier reviews by Walter Bustello and David Light also praised Melkomian's efforts.

B. **Age Disclosure, Duty Removal, and Preferential Treatment**

19. On August 24, 2025, Mansell announced Melkomian's age to coworkers by saying "Happy 61," even though Melkomian had not disclosed his age to his coworkers and did not want it announced.

20. A coworker responded, "I didn't know you were 61, wow."

21. Around the same period, VTG hired younger white employees, removed Melkomian's work responsibilities, stopped assigning him new work, and gave younger white employees preferential authority and treatment.

22. VTG changed Melkomian's role from Cloud Architect to Capacity Manager, substantially reduced his core architectural responsibilities and professional authority, and required him to take direction from Zac Burke, a younger white employee.

23. Bradley Blackwell excluded Melkomian from several projects, further diminishing Melkomian's responsibilities, status, and opportunities to contribute.

24. The removal of duties and reassignment materially disadvantaged Melkomian by depriving him of core work, authority, assignments, and the professional opportunities associated with his Cloud Architect position.

25. Younger, white, and American-born employees were not subjected to the same scrutiny, duty removal, subordination, or corrective action imposed on Melkomian.

C. **Opposition to Race Discrimination**

26. During his employment, Melkomian encouraged VTG to hire African American candidate Donovan Hill to improve racial diversity.

27. On 9/17/2025, Melkomian told Gary Mansell/Andrea Parsons about Donovan Hill being a hard-working employee and he urged VTG to give Hill fair consideration without regard to race.
28. VTG knew of Melkomian's opposition because he communicated it directly to decisionmaker(s) before VTG stripped his duties, disciplined him, placed him on leave, and terminated him.
29. VTG ultimately hired Hill but later minimized Melkomian's advocacy by characterizing it as merely a staffing suggestion rather than opposition to discriminatory hiring.

D. **Abrupt Discipline, Artificial-Intelligence Accusation, and Shifting Explanations**

30. Before January 6, 2026, VTG had not given Melkomian a prior warning or disciplinary meeting, and neither Human Resources nor Mansell had discussed with him the later-asserted performance accusations.
31. On January 6, 2026, Mansell and Burke issued Melkomian a "Final" written warning marked only for "Failure to Follow Instructions" and "Other: Cooperation with subcontractor CloudFit."
32. The warning did not mark "Poor Performance," "Policy Violation," "Unauthorized Use of Equipment/Materials," or "Falsification of Records" as a basis for discipline.
33. The warning directed Melkomian to follow only tasks provided by Burke and to route internal communications through Mansell before customer delivery.
34. The warning listed no follow-up date, lacked Melkomian's signature, and left the general-manager and Human Resources signature lines blank.

35. VTG suspended Melkomian's account by approximately 6:00 p.m. that day and placed him on administrative leave.

36. Mansell later told Melkomian that the leave was procedural and that he should return to work soon.

37. On the night of January 12, 2026, however, Mansell told Melkomian that he had been terminated and instructed him to return his equipment and badge the next morning.

38. When Melkomian asked why, Mansell stated that the reason was Melkomian's use of ChatGPT.

39. Melkomian denied using ChatGPT for work.

40. ChatGPT was not permitted in the secure Air Force facility where Melkomian worked.

41. At a meeting, other VTG engineers stated that they use Claude, another artificial-intelligence platform, as they favor its code deciphering capabilities, a fact known to VTG. Engineers also use ChatGPT, a fact that the company is aware of.

42. Air Force personnel sent emails authorizing Google Gemini for artificial-intelligence work and sponsored courses that Melkomian attended in December 2025, approximately one month before his termination.

43. Melkomian used Google Gemini for work and did not use any other artificial-intelligence platform for work.

44. An email attributed to Secretary Pete Hegseth encouraged Air Force personnel to use artificial intelligence and Google Gemini to make work more efficient.

45. Melkomian identified other employees who accessed outside digital tools or services but were not suspended, disciplined, or terminated.

46. VTG later asserted additional reasons for the termination, including alleged overstepping, incorrect communications, interference with travel, technical escalations, disclosure of a data discrepancy, communications about confidential markups, use of a USB drive, and work outside Melkomian's assigned role.

47. VTG did not meaningfully communicate those accusations to Melkomian when the alleged events occurred, and its January 6 warning did not cite poor performance, artificial-intelligence misuse, or unauthorized removable media.

48. Melkomian did not learn of VTG's later-asserted criticisms of his work until they surfaced in his divorce case.

49. Mansell hired Melkomian and later participated in narrowing his role, issuing the final warning, placing him on leave, and terminating him.

50. The abrupt escalation from awards, a raise, bonuses, and a highly positive October 2025 review to a final warning and termination, together with VTG's changing explanations and disparate discipline, supports the inference that VTG's stated reasons were pretextual.

**E. Harm to Melkomian**

51. Melkomian has remained unemployed since VTG terminated him and has sought work.

52. He paid $804 in COBRA premiums to maintain his CIGNA health coverage after the termination.

53. As a direct and proximate result of VTG's conduct, Melkomian has suffered and continues to suffer lost wages, lost benefits, loss of professional opportunities, out-of-pocket expenses, and other compensable harm.

## COUNT I — TITLE VII: RACE, ANCESTRY, AND NATIONAL-ORIGIN DISCRIMINATION

54. Melkomian incorporates paragraphs 1 through 53.

55. Melkomian is Armenian, was born in Iran, was qualified for his position, and performed his work successfully, as demonstrated by VTG's raises, bonuses, awards, and positive reviews.

56. VTG subjected Melkomian to adverse and disadvantageous employment actions, including stripping his core duties, changing his role and reporting relationship, imposing a final warning, placing him on leave, and terminating his employment.

57. VTG treated younger white and American-born employees more favorably with respect to assignments, authority, scrutiny, and discipline.

58. Melkomian's race, Armenian ancestry, and national origin were motivating factors in VTG's challenged actions.

59. VTG thereby engaged in unlawful intentional discrimination in violation of Title VII.

## COUNT II — ADEA: AGE DISCRIMINATION

60. Melkomian incorporates paragraphs 1 through 59.

61. The ADEA prohibits an employer from discharging or otherwise discriminating against an employee concerning compensation, terms, conditions, privileges, opportunities, or status because of age.

62. Melkomian was 61 years old and therefore within the class protected by the ADEA when VTG removed his duties, subordinated him to a younger employee, disciplined him, placed him on leave, and terminated him.

63. Mansell publicly announced Melkomian's age, after which VTG hired and favored younger white employees while progressively diminishing Melkomian's role despite his strong performance.

64. VTG would not have stripped Melkomian's duties, changed his role and reporting relationship, disciplined him, placed him on leave, or terminated him but for his age.

65. VTG's violation was willful because it acted knowingly or with reckless disregard for whether its conduct violated the ADEA.

## COUNT III — 42 U.S.C. § 1981: RACE AND ARMENIAN-ANCESTRY DISCRIMINATION

66. Melkomian incorporates paragraphs 1 through 65.

67. Section 1981 protects against intentional discrimination based on ancestry or ethnic characteristics.

68. Armenian identity is cognizable for purposes of a § 1981 claim, and an at-will employment relationship in South Carolina may support such a claim.

69. Melkomian's employment relationship with VTG was contractual, including to the extent it was at will.

70. Because of Melkomian's Armenian race, ancestry, and ethnicity, VTG intentionally impaired his right to make, perform, enforce, and enjoy the benefits of his employment

relationship by removing his duties, subordinating him to a younger white employee, disciplining him, placing him on leave, and terminating him.

71. VTG's conduct was intentional, malicious, or undertaken with reckless indifference to Melkomian's federally protected rights.

## COUNT IV — TITLE VII: RETALIATION

72. Melkomian incorporates paragraphs 1 through 71.

73. Title VII protects informal opposition that communicates an employee's reasonable belief that an employer has engaged in unlawful discrimination, including advocacy on behalf of another person.

74. Melkomian engaged in protected activity when he opposed race discrimination in hiring and advocated for fair consideration of Donovan Hill, an African American candidate.

75. VTG knew of that protected activity because Melkomian communicated his opposition to Mansell/other decisionmaker(s).

76. After and because of Melkomian's opposition, VTG removed his duties, subjected him to diminished authority and increased scrutiny, issued a final warning, placed him on leave, and terminated him.

77. Melkomian's protected opposition was the but-for cause of those actions, and VTG's asserted reasons were pretextual.

78. VTG thereby retaliated against Melkomian in violation of Title VII.

## COUNT V — 42 U.S.C. § 1981: RETALIATION

79. Melkomian incorporates paragraphs 1 through 78.

80. Section 1981 prohibits retaliation against a person who opposes race discrimination.

81. Melkomian opposed race discrimination in hiring and advocated for fair consideration of Donovan Hill.

82. VTG knew of Melkomian's opposition and thereafter impaired his employment relationship by stripping his duties, diminishing his authority, disciplining him, placing him on leave, and terminating him.

83. VTG took those actions because of Melkomian's protected opposition and would not have taken them absent that opposition.

84. VTG's conduct was intentional, malicious, or undertaken with reckless indifference to Melkomian's federally protected rights.

## PRAYER FOR RELIEF

WHEREFORE, Melkomian respectfully requests that the Court enter judgment in his favor and against VTG and:

1. Declare that VTG's conduct violated Title VII, the ADEA, and 42 U.S.C. § 1981;
2. Enjoin VTG from engaging in unlawful discrimination and retaliation and order appropriate corrective measures;
3. Order reinstatement to Melkomian's former position, with restored duties, seniority, compensation, and benefits, or award front pay if reinstatement is not feasible;
4. Award back pay, lost benefits, prejudgment interest, and other equitable monetary relief;
5. Award compensatory damages for pecuniary and nonpecuniary losses to the extent permitted by law;

6. Award liquidated damages for VTG's willful ADEA violation;
7. Award punitive damages under Title VII and § 1981 because VTG acted with malice or reckless indifference to Melkomian's federally protected rights, subject to applicable law, including 42 U.S.C. § 1981a;
8. Award reasonable attorney's fees, litigation expenses, and taxable costs;
9. Award pre- and post-judgment interest as permitted by law;
10. Prevent duplicative recovery while awarding Melkomian the fullest relief available under each applicable statute; and
11. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Melkomian demands a trial by jury on all issues so triable.

Respectfully submitted,

**WALLACE LAW FIRM**

s/ Aaron V. Wallace
Aaron V. Wallace
Federal Bar No. 100255
1416 Laurel Street, Suite B
Columbia, South Carolina 29201
Telephone: 803-766-3997
Facsimile: 839-218-5786
Email: awallace@wallacefirmsc.com

Counsel for Plaintiff Edmond Melkomian